UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CLAUDETTE TRACEY,<br>*Plaintiff,*<br><br>v.<br><br>STATE OF CONNECTICUT<br>DEPARTMENT OF SOCIAL SERVICES,<br>RYANN MACDONALD, EDWARD<br>DONROE, DIANE BENEDETTO,<br>*Defendants.* | 3:17-cv-745 (KAD)<br><br><br><br><br><br><br><br>June 19, 2019 |

**MEMORANDUM OF DECISION RE:**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 74)**

Kari A. Dooley, United States District Judge

**Preliminary Statement of the Case**

The Plaintiff, Claudette Tracey, brings this case against her former employer and several of her former colleagues, alleging violations of 42 U.S.C. § 1983 (age discrimination, hostile work environment, and retaliation) and Title VII of the Civil Rights Act of 1964 (national origin, hostile work environment, and retaliation). On February 19, 2019, the Defendants moved for summary judgment as to all counts. (ECF No. 74.) The Plaintiff filed an opposition to the Defendants' motion on April 24, 2019. (ECF No. 81.) For the following reasons, the Court **GRANTS** the Defendants' motion for summary judgment in its entirety.

**Standard of Review**

The Defendants are entitled to summary judgment if they demonstrate that "there is no genuine dispute as to any material fact and that [they are] entitled to judgment as a matter of law." *Celotex Corp. v. Catretti*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party," while a fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At summary judgment, the movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323; *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Where the non-movant bears the burden of proof at trial, the movant's initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *Celotex Corp.*, 477 U.S. at 325. Once a movant has met this burden, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations and internal quotations omitted). Nor will wholly implausible alleged facts or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (citing *Matsushita,* 475 U.S. at 585–86). In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian,* 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). Rather, the Court must decide whether a rational juror could find in favor of the non-moving party. *Id.*

**Facts**

As a preliminary matter, the Court addresses the parties' compliance with Local Rule 56(a). When a party fails to appropriately deny facts set forth in the movant's Local Rule 56(a)(1) Statement, those facts are deemed admitted. *See Shetucket Plumbing Supply Inc. v. S.C.S. Agency, Inc.*, 570 F.Supp.2d 282, 283 (D. Conn. 2008) (facts "deemed admitted because [they have] not been squarely denied with specific citation to evidence in the record as Local Rule 56(a)(3) requires."); Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact … the court may … consider the fact undisputed for purposes of the motion."); D. Conn. L. Civ. R. 56(a)(3) ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence."). Further, Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *S.E.C. v. Glob. Telecom Servs., L.L.C.*, 325 F.Supp.2d 94, 109 (D. Conn. 2004).

The Plaintiff's Rule 56(a)(2) Statement of Facts in Opposition to Summary Judgment runs afoul of these holdings and the rule itself in several ways. For example, at paragraphs 23 and 28 of her supplemental statement of facts, the Plaintiff cites to "[r]ecord, generally."[1] The Plaintiff attached over 1,400 pages of documents and transcripts to her opposition. Directing the Court to this record without specific citation is not adequate. *See* D. Conn. L. Civ. R. 56(a)(3); *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) ("nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a

---

[1] *See* ECF No. 81-1, 33 ("Ms. Tracey was a new hire who made serious complaints about a popular and valued employee in a way that was protected by law. Instead of treating the headache seriously, as required by law, Ms. Tracey was immediately shown the door for a contrived reason. See record, generally."); *id*. at 34 ("The undisputed record shows that Ms. Tracey was a conscientious hard-working employee who was always on time and tried her best. The most significant objective fact that made her stand out was that she was outspoken in her lack of tolerance of what she considered unacceptable behavior from her supervisors. Record, generally.").

motion for summary judgment"). Moreover, the purported "facts" are merely a summary of the Plaintiff's argument. As such, these paragraphs cannot be relied upon to create a genuine issue of material fact. In addition, many of the Plaintiff's responses on her Local Rule 56(a)(2) Statement are replete with argument, as discussed below. This too is inappropriate. *See* D. Conn. L. Civ. R. 56(a)(3); *see also Risco v. McHugh*, 868 F.Supp.2d 75, 88 (S.D.N.Y. 2012) ("the Statement improperly interjects arguments and/or immaterial facts in response to facts asserted by Defendant, without specifically controverting those facts"); *Costello v. New York State Nurses Ass'n*, 783 F.Supp.2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding plaintiff's responses to defendant's Rule 56(1) statement where plaintiff responded with conclusory allegations or legal arguments); *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996) ("mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment").

The following facts are therefore either expressly undisputed or deemed admitted by the Plaintiff's failure to comply with Local Rule 56(a)(3). *See, e.g.*, *Knight v. Hartford Police Dept.*, No. 3:04-cv-969 (PCD), 2006 WL 1438649, at *4 (D. Conn. May 22, 2006) (deeming as admitted certain statements of fact that the opposing party failed to unambiguously deny and failed to offer a citation to admissible evidence that would support a denial).

On March 13, 2015, the Plaintiff applied for the position of Connecticut Careers Trainee ("CCT") at the Department of Social Services. (ECF No. 74-2 ¶ 3.) The job posting itself stated that "CCTs will be continuously evaluated on their progress during the yearlong training period. Trainees must demonstrate that they have successfully completed all areas of instruction and have mastered the necessary knowledge and skills to advance to the Eligibility Services Worker target classification." (*Id.* ¶ 2.) DSS confirmed the Plaintiff's hiring via letter on August 7, 2015, reiterating that "As a Connecticut Careers Trainee you will be required to complete one (1) year

in the training position. During this period, your suitability for state service and your position will be evaluated." (*Id.* ¶ 4.) Because the CCT position "is a training classification, CCT employees do not have permanent status in the state employment system, and are not covered under any 'just cause' from dismissal protections …." (*Id.* ¶ 17.) The one-year training program "constitutes a probationary period during which the CCT employee's work is closely monitored by the supervisor, [and] the employee's performance is formally evaluated, with efforts made by the employing agency to support the employee in reaching the goals of the training program." (*Id.* ¶ 13.) CCT employees can be dismissed if DSS determines that "the employee is not satisfactorily progressing in the training program and is not adequately performing the duties required of the position." (*Id.* ¶ 14.) If a CCT employee is "counseled on performance at the three (3) month assessment and has not satisfactorily progressed by the six (6) month assessment and it is determined the CCT employee is not adequately performing the duties of the position" they are "dismissed … generally no later than six (6) months from date of hire." (*Id.* ¶ 18.)[2]

DSS assigned the Plaintiff to its New Haven Office, in the "Generalist Unit," which was headed by Lisa A. Wells, Social Services Operational Manager. Wells, in turn supervised Eligibility Services Supervisor Edward Donroe, a defendant herein. Defendant Donroe was the Plaintiff's direct supervisor. (*Id.* ¶ 6.) Defendant Donroe also supervised Defendant Ryann McDonald, who was assigned to help train the Plaintiff. As a new DSS employee, the Plaintiff "underwent new employee orientation, which included learning DSS policies and procedures including DSS Affirmative Action/Equal Employment Opportunity policy, anti-harassment and complaint procedures." (*Id.* ¶ 7.) The Plaintiff further underwent training on November 19, 2015 and December 2, 2015, regarding employee human rights protections, DSS Affirmative

---

[2] The Plaintiff denies this "as to the word 'generally,'" though the dispute is immaterial to the disposition of the case.

5

Action/Equal Employment Opportunity training, and Understanding Workplace Diversity and Cultural Responsiveness. (*Id.* ¶ 8.) The relevant DSS policies which prohibit discrimination and harassment on the basis of race, color, gender, national origin, and other protected categories, include a complaint procedure which encourages employees to bring complaints of discrimination or harassment to the agency's attention. Employees are also provided information about how to bring complaints to external agencies such as the Commission on Human Rights and Opportunities. (*Id.* ¶ 9.)[3]

As part of the training program, the Plaintiff participated in formal "CORE (acronym for 'Curriculum for Orientation, Reinforcement, and Enrichment') training," conducted by Thomas Scott McDonald (*Id.* ¶¶ 21-22.) During the first CORE evaluation, the Plaintiff only answered 22 out of 42 questions, getting 4 answers incorrect. (*Id.* ¶ 25.) By comparison, nine other CORE trainees answered all 42 questions, getting only six questions incorrect. (*Id.*) McDonald reported the results of the Plaintiff's performance to Defendant Donroe via email on October 20, 2015 and November 4, 2015. (*Id.* ¶¶ 26-27.) McDonald also prepared a feedback report, which characterized the Plaintiff as "need[ing] improvement" in eight out of the twelve subjects covered by the CORE training. (*Id.* ¶ 31.) McDonald met with the Plaintiff on November 4, 2015, to discuss her pending three-month performance evaluation and his "concern about her problems with navigating and working with the [Eligibility Management System] in particular." (*Id.* ¶ 33.) In his feedback report, McDonald assessed the Plaintiff's performance in a case study exercise as "deficient." (*Id.* ¶ 35.)

In addition to the formal CORE training provided to the Plaintiff, DSS also provided the Plaintiff with on-the-job training. (*Id.* ¶ 37.) Specifically, the Plaintiff would worked with Defendants Donroe, Defendant Ryann MacDonald, Brian J. Buckley and Unique Shephard. (*Id.*)

---

[3] Although the Plaintiff admits the existence of the policy in her Rule 56(a)(2) Statement, she goes on to argue that the policy was not followed in her case, with citations to the record which do not fairly support such a claim.

Defendant MacDonald communicated her observations of the Plaintiff's performance in a series of emails to Defendant Donroe. (*Id.* ¶ 38.) Buckley did the same. (*Id.* ¶ 39.)

On November 4, 2015, Defendant Donroe gave the Plaintiff an "unsatisfactory" three-month "performance appraisal." (*Id.* ¶ 41.) Specifically, the Plaintiff received "less than good" ratings on the job elements of knowledge of work ("requires considerable assistance"), quantity of work ("volume below average"), quality of work ("often unacceptable, frequent errors or rejections"), and ability to learn new duties ("requires a great deal of instruction"). (*Id.*) The appraisal further noted that the Plaintiff "is having difficulty using the computer and completing her assignments timely" and "is slow at using keyboard." (*Id.* ¶ 42.)

Prior to the appraisal, however, Defendant Donroe told the Plaintiff that her evaluation would not be good, but that DSS would continue to work with her for 6 weeks "with two leads." (*Id.* ¶ 43.) Defendant Donroe assigned Defendant MacDonald and Buckley, even though the Plaintiff had claimed Defendant MacDonald "talk[ed] down to her." (*Id.*)[4] In this regard, Defendant Donroe testified that "Ryann is one of my best leads. The smartest person that I could put on the case[.] [The Plaintiff's] best chances of success would be to be trained by Ryann. Ryann is a direct person. She's what she speaks. I did not see any valid complaint to remove her from the training process." (*Id.* ¶ 44.)

At the end of November 2015, Defendant Donroe issued a memorandum to the Plaintiff, entitled "Performance Expectations," which identified areas of concern that, despite training and assistance, were still problematic. (*Id.* ¶ 46.) The memorandum included steps that would be taken "[i]n order to help [the Plaintiff] facilitate improvement." (*Id.*) The memorandum further stated that "[w]e will meet again formally in six (6) weeks to review progress. Please be forewarned that

---

[4] The Plaintiff denies "Donroe's characterization of his conversation" with the Plaintiff, though offers no citation to evidence in the record supporting her denial. In any event, the denial is immaterial.

7

continued unsatisfactory performance may result in dismissal in your probationary period." (*Id.* ¶ 47.)

Defendant Donroe met with the Plaintiff on December 14, 2015 and December 18, 2015, telling her that the information he was receiving from the Leads was that she was still too slow at processing, that she frequently asked the same questions, and she still struggled with retaining information. (*Id.* ¶ 49.) At the latter meeting, which was halfway through the six-week performance review period, he told her that she "was not at a desired level of knowledge with both programs and computer usage." (*Id.* ¶ 50.) The Plaintiff told Defendant Donroe that she felt "intimidated" by Defendant MacDonald. (*Id.*) The Plaintiff requested that Defendant Donroe spend more time with her in training, (*id.*), which he did, (*id.* ¶ 51).[5] The Plaintiff never told Defendant Donroe that Defendant MacDonald "had ever used any racial, national origin, or age-based remarks" toward her. (*Id.* ¶ 53.)[6]

On December 22, 2015, Principal Human Resources Specialist Jessica Hajdasz emailed Wells, stating in pertinent part: "If [the Plaintiff's performance] is not improving, please draft a second unsat[isfactory performance appraisal] and we can look to drop her. I will just want to review the evaluation and I can assist with the letter." (*Id.* ¶ 57.) Wells, who is African-American, "determined that based on the information from ESS Donroe, CORE Trainer Scott McDonald, and information from the Leads ESS Ryann MacDonald and Brian Buckley, and her own 32 years experience with DSS, that plaintiff was not keeping up with the demands of the ESW job duties, 'was not suited for the ESW position,' and that '[b]ased on [her] long experience at DSS, there was no question that [the Plaintiff] was not able to successfully perform the demanding duties of

---

[5] The Plaintiff offers a blanket denial to the entire paragraph, though her response neither rebuts nor mentions the Defendants' fact that Defendant Donroe spent more time with her in training. In any event, the denial is immaterial.
[6] The Plaintiff denies this, though offers no citation to evidence in the record to the contrary.

8

an ESW." (*Id.* ¶ 59.) Wells replied to Hajdasz's email, relaying that the Plaintiff "is still not able to process cases on her own without assistance and numerous errors are still being found. Mr. Donroe has been continuously meeting with her to cover over her mistakes." (*Id.* ¶ 60.)

On January 6, 2016, a second unsatisfactory performance appraisal was delivered to the Plaintiff. It included "five job elements that were 'less than good.' Ratings for 'Quantity of work' and 'Ability to Learn new Duties' were both lowered from the November 4, 2015 performance appraisal, to the lowest rating." (*Id.* ¶ 62.) The Plaintiff refused to sign the appraisal and has testified that she "didn't agree with anything that it said." (*Id.* ¶ 63.) That same day, the Plaintiff, along with her union representative, attended a meeting with Defendant Donroe, Wells and Hajdasz, during which Hajdasz explained that the Plaintiff would be dismissed from the CCT position because of this second unsatisfactory performance appraisal. (*Id.* ¶ 64.) The Plaintiff thereafter received a dismissal letter dated January 6, 2016. (*Id.* ¶ 65.) The dismissal letter informed the Plaintiff that she could request a "Sperl Conference" – "a meeting with the agency employer to 'review in good faith [its] own exercise of discretion'"- at which the Plaintiff "could present any facts that she would like to be considered." (*Id.* ¶ 66.) After the dismissal meeting but prior to the Sperl conference, the Plaintiff told Hajdasz that Defendant MacDonald had not been nice to her. (*Id.* ¶ 67.) Hajdasz told the Plaintiff to bring up any concerns she had at the Sperl Conference. (*Id.* ¶ 67.)

The Sperl Conference was held on January 22, 2016 and was led by Defendant Diane Benedetto. (*Id.* ¶ 69, 70.) The Plaintiff stated that she "felt the decision to dismiss her was unfair, was based on her race and age, and that she did not like" having to work with Defendant MacDonald. (*Id.* ¶ 70.) Although she maintained that Defendant MacDonald had been disrespectful toward her, the Plaintiff never claimed at the Sperl Conference that Defendant

9

MacDonald had used age-based, national origin-based, or race-based comments." (*Id.* ¶ 71.)[7] Defendant Benedetto, having reviewed the circumstances resulting in the Plaintiff's dismissal, determined there was "no information to support [the Plaintiff's] claim that the decision was unfair, unjust, or there was any information presented that contradicted the factual basis of the unsatisfactory performance appraisals." (*Id.* ¶ 72.) By letter dated January 28, 2016, Defendant Benedetto told the Plaintiff that "[a]s a result of all the information provided, I have decided that the decision to separate you from State service will remain in effect." (*Id.*)

On February 10, 2016, the Plaintiff filed a discrimination complaint with the Commission on Human Rights and Opportunities, claiming that her dismissal was based on "race, color, age, and national origin (Jamaica)." (*Id.* ¶ 75.) She alleged that she was never informed that she had made any mistakes, that she was supposed to have had 18 months to learn the position, and that she was not provided appropriate training. (*Id.*) In her written rebuttal to the DSS Answer to the CHRO complaint, the Plaintiff alleged that she told Defendant Donroe that Defendant MacDonald talked down to her in a derogatory manner. (*Id.* ¶ 76.) Notably, during the course of her employment with DSS, the Plaintiff neither made a written nor oral complaint of any kind to the DSS Office of Affirmative Action/Equal Employment Opportunity, claiming that she had been discriminated against in any fashion. Nor did she inform her Human Resources Specialist, who was on-site in New Haven three days a week, that anyone ever made derogatory remarks toward the Plaintiff that were age-based, race-based, or national-origin based. (*Id.* ¶¶ 73, 74.)

At her deposition taken in this action, the Plaintiff testified, for the first time, that MacDonald told the Plaintiff she was "old." (*Id.* ¶ 81.) She claimed, again for the first time, that

---

[7] The Plaintiff, in denying this, contends that she "repeatedly complained of Ms. Macdonald's [sic] outrageous behavior, beginning a few days into her job. It is beyond disgingenous hair-splitting to state that she only complained generally about Macdonald's [sic] 'direct' demeanor, and then first alleged discrimination, without any specifics, at the Sperl conference." The Plaintiff offers no citation to evidence in the record to support her denial.

she told Defendant Donroe that Defendant MacDonald said, "I was old, I – it seems as if I (sic) Alzheimer's, and where did I get my degree." (*Id.*) She further claimed that Defendant MacDonald told her, "You Jamaicans think somebody owe you." (*Id.* ¶ 83.) She acknowledged, however, that she did not include these allegations in either her CHRO complaint or her complaint in the instant matter because she was "informed that I don't have tell everyone at once, so just like you – the songs that you – hold back something, you don't say everything then, and what I understand is that you don't have to tell everything at once, so that's why I held it back." (*Id.* ¶ 82.) To be clear, she admitted that she never previously alleged in her CHRO complaint or filings in the instant matter that Defendant MacDonald had made a derogatory comment about national origin: "I didn't because I was saving it for a later date." (*Id.* ¶ 84.)

**Discussion**

*Discrimination and Retaliation Claims*

The Plaintiff alleges age discrimination in violation of Section 1983 (Count One), national origin discrimination in violation of Title VII (Count Four), retaliation in violation of Section 1983 (Count Three), and retaliation in violation of Title VII (Count Six). The Plaintiff's discrimination and retaliation claims are subject to the familiar *McDonnell-Douglas* burden-shifting test, which requires that the Plaintiff first make out a *prima facie* case for each claim. *McDonnell Douglas Corp., v. Green*, 411 U.S. 792, 802 (1973); *see Piccone v. Town of Webster*, 511 F. App'x 63, 64 (2d Cir. 2013) (age discrimination claims); *Brown v. City of Syracuse*, 697 F.3d 141, 150 (2d Cir. 2012) (national origin claims); *Zann Yiwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (retaliation claims).

*Discrimination*

"To establish a *prima facie* case of age discrimination, a plaintiff must show four things: (1) [s]he is a member of the protected class; (2) [s]he is qualified for [her] position; (3) [s]he has suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of age discrimination." *Piccone*, 511 F. App'x at 64 (citation omitted). "Once the plaintiff has made out a *prima facie* case, the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions. If the employer articulates such a reason, the presumption of age discrimination dissolves, and the burden shifts back to the plaintiff to prove that the employer's stated reasons are merely pretextual and that age discrimination was the true reason for the adverse employment action." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (citations omitted).

Similarly, to establish a *prima facie* case of national origin discrimination under Title VII, the Plaintiff must show that "(1) [she] belonged to a protected class; (2) she was qualified for the position [she] held; (3) [she] suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown*, 697 F.3d at 150.

For purposes of this motion, the Defendants concede that the Plaintiff can meet the first three prongs to establish *prima facie* cases of age and national origin discrimination, but they argue that there is "no evidence" to establish the fourth prong, that is, an inference of discrimination. (ECF No. 74-1, 14.). The Plaintiff disagrees and relies upon statements of Defendant MacDonald as evidence of the Defendants' discriminatory intent. The evidence regarding these statements, however, comes from the Plaintiff's deposition testimony. The Plaintiff asserts that this evidence raises a genuine issue of material fact, rendering summary judgment inappropriate.

The defendants urge the Court to disregard this testimony as a "sham issue of fact." *See In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013). The "sham issue of fact" doctrine is designed to vindicate "the utility of summary judgment as a procedure for screening out sham issues of fact," *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969), and champions testimony subject to cross-examination (such as deposition testimony) over other statements because of its heightened reliability, *see id.* The doctrine "typically applies where a party submits an affidavit that contradicts *its own prior statements*." *Hengjin Sun v. China 1221, Inc.*, No. 12-CV-7135 RJS, 2015 WL 5542919, at *4 (S.D.N.Y. Aug. 12, 2015) (emphasis in original). Here, the inverse situation is presented. The Defendants urge its application to the Plaintiff's *deposition* testimony because this testimony was contradicted by all the Plaintiff's previous statements regarding these claims, to include the allegations in her complaint.

Although the Second Circuit has cautioned that district courts generally "should not weigh evidence or assess the credibility of witnesses," *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996), it has held that in the "rare circumstances" where a plaintiff's testimony is "contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citations omitted; quoting *Anderson*, 477 U.S. at 252). In "certain extraordinary circumstances, where the facts alleged are so contradictory that doubt is cast upon their plausibility, the court may pierce the veil of the complaint's factual allegations and dismiss the claim. To hold otherwise, and require district courts to allow parties to defeat summary judgment simply by testifying to the allegations in their pleadings (or, as here, to facts *not* alleged in their pleadings), would license the mendacious to seek windfalls in the

litigation lottery." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (citations and quotations omitted). As one court in this District recently noted: "A plaintiff's deposition testimony need not be credited by the Court in the context of summary judgment where the testimony is 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint.'" *Jenkins v. Rd. Scholar Transportation, LLC*, No. 3:16-CV-554 (JBA), 2019 WL 145516, at *4 (D. Conn. Jan. 9, 2019) (citing *Jeffreys*, 426 F.3d at 555).

The Court has read the Plaintiff's deposition in its entirety. Therein, the Plaintiff alleged for the first time that (1) Defendant MacDonald made derogatory comments about her age; (2) Defendant MacDonald made derogatory comments about her national origin (Jamaican); and (3) she complained to Defendant Donroe about the age-related derogatory comments.

As was the case in *Jenkins*, the Plaintiff's deposition testimony relating to allegations against MacDonald "lack[] corroboration elsewhere in the record" and is "substantially undermined" by her failure to assert these allegations in prior proceedings. The Plaintiff did not report the alleged discriminatory conduct to personnel in Human Resources; did not present these allegations at her Sperl Conference; and did not file a complaint with the DSS Affirmative Action/Equal Employment Opportunity Office. Indeed, the Plaintiff's deposition testimony contradicts the allegations in her own pleadings. The Plaintiff's Original and Amended Complaints contain no allegations of Defendant MacDonald making age-based or national origin-based remarks. And not surprisingly, nor do they contain any allegations that she reported such discriminatory remarks to Defendant Donroe.

Moreover, her testimony is further undermined by substantial evidence in the record as to what the Plaintiff *did* say at various points in time. Contemporaneous email correspondence

demonstrates that the Plaintiff's complaints about Defenadant MacDonald, made during her employment, were that Defendant MacDonald "talked down to" and was otherwise "disrespectful" to the Plaintiff. None of these complaints or allegations, however, raise the specter of discrimination. Accordingly, the Plaintiff cannot rely upon her deposition testimony to create a genuine issue of material fact.

The Plaintiff points to no other evidence of discriminatory intent and, indeed, there is none. The Plaintiff has failed to demonstrate a genuine issue of material fact as to the fourth prong of a *prima facie* case for either age or national origin discrimination. Summary judgment therefore is appropriate on Counts One and Four.

Assuming, *arguendo*, that the Plaintiff *could* and *did* establish *prima facie* cases of discrimination, the burden shifts to the Defendants "to articulate some legitimate, nondiscriminatory reason" for the Plaintiff's dismissal. *McDonnell Douglas Corp.*, 411 U.S. at 802. In this regard, the evidence of a legitimate, nondiscriminatory reason is overwhelming. As detailed above, the undisputed facts reveal the meticulous process by which the Defendants attempted to train the Plaintiff for the EWS position, assess the Plaintiff's skills, and provide support throughout her course of employment. It is undisputed that the Defendants, through objective observation and evaluation, identified areas of professional weakness and sought to strengthen the Plaintiff's performance. Ultimately, her performance did not improve, and in fact, it got worse by objective measure. Despite her colleagues' efforts to continue to work with her, the Plaintiff could not perform the work to the satisfaction of DSS and she was terminated. In short, the Defendants have established a legitimate, nondiscriminatory reason for the Plaintiff's dismissal. *See Cross v. New York City Transit Auth.*, 417 F.3d 241, 250 (2d Cir. 2005) (noting that a failure to "perform satisfactorily" is a legitimate, nondiscriminatory reason for dismissal);

*Johnson v. Schmid*, 750 F. App'x 12, 17 (2d Cir. 2018) ("The Department has articulated "a legitimate, non-discriminatory reason" for firing Johnson -- his poor performance."); *Kelly v. Signet Star Re, LLC*, 971 F. Supp. 2d 237, 248 (D. Conn. 2013) ("As the Second Circuit noted over a decade ago, poor job performance is 'no doubt ... a legitimate nondiscriminatory reason for ... termination.'") (citing *Sutherland v. New York State Dep't of Law*, F.3d 1073 (2d Cir. 2000) (summary order)).

The burden thus shifts back to the Plaintiff, who must show "that the legitimate reasons offered by the defendant[s] were not [their] true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (finding that a plaintiff must rebut evidence of legitimate, nondiscriminatory reasons for dismissal with specific evidence tending to show not only that those reasons were a pretext, but that unlawful discrimination was the real reason for the employment decision).

The Plaintiff does not address the question of pretext in the context of the discrimination claims. She correctly asserts, however, that she can (and presumably does) rely upon the same evidence which permitted the inference of discriminatory intent in her *prime facie* case to establish pretext. *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) ("Pretext may be demonstrated either by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence,' or by reliance on the evidence comprising the prima facie case, without more.") (citing *Burdine*, 450 U.S. at 256; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993)).

As discussed above, the Plaintiff relies upon her own deposition testimony regarding the derogatory and discriminatory statements made by Defendant MacDonald, which this Court has

already disregarded as being so improbable that no reasonable juror could, under the circumstances presented here, credit her. *See Jenkins*, 2019 WL 145516, at *4. Thus, the Plaintiff has not raised a genuine issue of material fact on the question of pretext.

In the context of her discrimination claims (Counts One and Four), the Plaintiff also asserts that there is a genuine issue of fact as to whether Defendant MacDonald was the Plaintiff's *de facto* supervisor. She offers no explanation or analysis as to why such a factual dispute is material to the motion for summary judgment. Her citation to the record does not support the purportedly competing evidence on this issue. In any event, it is undisputed that Defendant MacDonald had no role in the decision to terminate the Plaintiff. Defendant MacDonald was one of three Leads who worked with the Plaintiff and reported on her progress to Defendant Donroe and, by extension, to Wells. Defendant MacDonald neither consulted with nor rendered an opinion to Defendant Donroe or Wells - or anyone at Human Resources - as to whether the Plaintiff should be terminated. The record is clear and there is no genuine dispute that the decision to terminate the Plaintiff was made by Wells in consultation with Human Resources personnel, pursuant to DSS policy. Whether Defendant MacDonald was the Plaintiff's *de facto* supervisor is of no moment.

Accordingly, the motion for summary judgment is GRANTED as to Counts One and Four.

### *Retaliation*

"As in discrimination claims, the elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015). "First, the plaintiff must establish a prima facie case of retaliation by showing: (1) [her] participation in protected activity; (2) defendant's knowledge thereof; (3) materially adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. Second, if the plaintiff meets this burden,

the defendant employer must then articulate a legitimate, non-retaliatory reason for its adverse employment action. Third, if the employer does so, then the burden shifts back to the plaintiff to prove that retaliation was a substantial reason for the adverse action." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 n.6 (2d Cir. 2011).

Here, the Plaintiff fails to establish a *prima facie* case of retaliation, starting with the first prong. The Plaintiff *admits* that she did not make any complaint to the CHRO about Defendant MacDonald's derogatory comments about her age and national origin. The Plaintiff admits that she did not follow any of the complaint procedures for bringing such conduct to the attention of Human Resources at DSS. The *only* evidence of protected activity came at her deposition when, for the first time, she testified about Defendant MacDonald's derogatory comments regarding her age *and* that she complained to Defendant Donroe about this comment. Notably, she did not testify at her deposition that she complained to Defendant Donroe about the alleged comments regarding her national origin. Thus, with respect to protected activity stemming from the allegations regarding her national origin, there is concededly no evidence. As to whether her deposition testimony creates an issue in dispute as to whether she engaged in protected activity, for the reasons previously articulated, it does not.

In her opposition, the Plaintiff discusses her complaints about Defendant MacDonald in very broad strokes. She argues that her complaints against a well-liked and respected employee motivated her termination. She argues that the Defendants, out of friendship and loyalty to Defendant MacDonald, determined to create a false and sham evaluation process so that the Plaintiff would be fired. The Court recognizes that the Plaintiff did complain about Defendant MacDonald and her manner of interacting with the Plaintiff. These complaints do not rise to the level of protected activity, however, because they did not derive from Defendant MacDonald's

discriminatory commentary or practices. *See Rojas*, 660 F.3d at 108 ("The competent evidence in the record showed that any complaints Rojas made were generalized and therefore the Diocese could not reasonably have understood that she was complaining of conduct prohibited by Title VII."); *Bento v. City of Milford*, 213 F.Supp.3d 346, 360 (D. Conn. 2016) ("Complaints presenting general allegations of harassment unrelated to protected class do not constitute protected activity under either Title VII or CFEPA."); *Risco*, 868 F.Supp.2d at 110 ("Generalized complaints about a supervisor's treatment are insufficient.").

The motion for summary judgment as to Counts Three and Six is therefore GRANTED.

***Hostile Work Environment***

The Plaintiff also alleges two hostile environment claims, one in violation of Section 1983 (Count Two) and the other in violation of Title VII (Count Five).

The Defendants contend that the Plaintiff has abandoned these claims because they are not addressed at all in the Plaintiff's opposition. The Court agrees. Where, as here, a counseled non-moving party submits a "partial response arguing that summary judgment should be denied as to some claims while not mentioning others," that response "may be deemed an abandonment of the unmentioned claims." *Jackson*, 766 F.3d at 195. Even "[w]here abandonment by a counseled party is not explicit," a court may infer abandonment "from the papers and circumstances viewed as a whole." *Id*. at 196. Here, the circumstances and papers fairly support an inference of the Plaintiff's abandonment of her hostile work environment claims. Specifically, the Plaintiff has not submitted "any argument or discussion" in support of her hostile work environment claims. *See Collins v. City of New York*, 295 F.Supp.3d 350, 361 (S.D.N.Y. 2018), *reconsideration denied,* No. 14-CV-08815 (AJN), 2019 WL 1413999 (S.D.N.Y. Mar. 29, 2019); *see also Burchette v. Abercrombie & Fitch Stores, Inc.*, No. 08-CV-8786 (RMB), 2009 WL 10699568, at *2 (S.D.N.Y. Sept. 16, 2009)

("The Court is not required to scour a party's various submissions to piece together appropriate arguments.") (citing *Weinstock v. Wilk*, No. 02 Civ. 1326, 2004 WL 367618, at *2 (D. Conn. Feb. 25, 2004). Accordingly, the motion for summary judgment as to Counts Two and Five is GRANTED.

For the foregoing reasons, the Court **GRANTS** the Defendants' Motion for Summary Judgment (ECF No. 74). The Clerk is directed to enter judgment in favor of the Defendants and to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 19th day of June 2019.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE